**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| DARCEL DIXON, AS ADMISTRATRIX OF THE ESTATE OF HAYWOOD DEAN DIXON, JR., DECEASED | : : : : | |
| Plaintiff, | : | |
| v. | : | Civil Action No: |
| | : | |
| YORK COUNTY PENNSYLVANIA | : | |
| | : | |
| AND | : | |
| | : | JURY TRIAL DEMANDED |
| YORK COUNTY PRISON BOARD | : | |
| | : | |
| AND | : | |
| | : | |
| JOHN/JANE DOE PRISON GUARDS 1-10 | : | |
| | : | |
| AND | : | |
| | : | |
| JOHN/JANE DOE PRIMECARE MEDICAL, INC EMPLOYEES 1-10 | : : | |
| | : | |
| AND | : | |
| | : | |
| PRIMECARE MEDICAL, INC. | : | |
| | : | |
| AND | : | |
| | : | |
| SOLICITOR, JONELLE HARTER ESCHBACH | : | |
| | : | |
| AND | : | |
| | : | |
| WARDEN, ADAM OGLE | : | |
| Defendants | : | |

## COMPLAINT

**NOW COMES** Darcel Dixon as duly appointed Administratrix of the Estate of

Haywood Dean Dixon, Jr., deceased, by and through chosen counsel David R. Cherry,

Esquire, of The Cherry Firm, P.C., and Joseph Silvestro, Esquire of the Law Office of

Joseph Silvestro, LLC, complaining of the conduct of the named defendants, and in support thereof states the following:

## NATURE OF THE ACTION

1.      On July 5, 2023, Haywood Dean Dixon, Jr. (hereinafter "Haywood"), standing 76" and weighing approximately 325 pounds, was arrested by Lower Windsor Township Police Department and charged with Possession of a Firearm, Resisting Arrest, Possession of a Controlled Substance and various traffic violations.  At the time of Haywood's arrest, he had a significant history of physical and mental health issues, which were known or should have been known to staff of the York County Prison (hereinafter "YCP") and PrimeCare Medical, Inc. (hereinafter "PrimeCare").  Neither Haywood nor anyone on his behalf was able to post bail, so, as a result, Haywood was brought to the YCP, where he complained of physical ailments throughout nearly the next two (2) days.  All of Haywood's complaints an pleas for assistance were ignored and he was found dead, alone in his cell on July 7, 2023, at 0006 hours.

## PARTIES

2.      Plaintiff, Darcel Dixon, is an adult individual, the mother of Haywood Dean Dixon, Jr., and the Administratrix of his Estate.

3.      Plaintiff, Darcel Dixon, has been appointed as the Administratrix of the Estate of Haywood Dean Dixon, Jr., deceased, on January 4th, 2024, by the Commonwealth of Pennsylvania, County of Lancaster.

4.      Defendants John/Jane Doe Prison Guards 1-10 are and/or were at all material times acting under the color of state law in the scope and course of their duties as prison guards with York County Prison.  Alternatively, Defendants John/Jane Doe Prison

Guards 1-10 acted outside of the scope and course of their duties and, therefore, are being sued in their individual capacity. In either capacity, they can be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401.

5.     Defendant York County is a county organized pursuant to the laws of the Commonwealth of Pennsylvania. York County owns and operates the York County Prison, and, along with Defendant York County Prison Board and Defendant Warden Adam Ogle, is responsible for the implementation of the prison's budget, personnel, staffing and training policies, procedures, practices, and customs. York County may be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401.

6.     Defendant York County Prison Board operated York County Prison on behalf of York County pursuant to state law. York County Prison Board may be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401.

7.     Defendant John/Jane Doe PrimeCare Employees 1-10 are employees of PrimeCare Medical, Inc., who, at all times material hereto, were contracted by York County to provide medical services within YCP. PrimeCare Employees 1-10 can be served at 3940 Locust Lane, Harrisburg, PA 17109

8.     PrimeCare Medical, Inc.(hereinafter "PrimeCare") is a Pennsylvania corporation with its principal place of business located at 3940 Locust Lane, Harrisburg, PA 17109.

9.     Defendant Jonelle Harter Eschbach, at all times material hereto, is the Solicitor for York County. She may be served at the Office of the York County Administrator, 28 E. Market Street, York, PA 17401. She is also a member of the York County Prison board which is responsible for the operation of York County Prison.

10.     Defendant Adam Ogle was, at all times material hereto, the Warden of York County Prison. He may be served at the Office of the York County Administrator 28 E.

Market Street York, PA 17401.

## JURISDICTION AND VENUE

11.    This Court has subject matter Jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 *28 USCS § 1331*, which provides federal question jurisdiction for claims arising

under the Constitution and laws of the United States, including 42 U.S.C. § 1983, *42*

*USCS § 1983*.  The Court also has jurisdiction under 28 U.S.C. § 1343 (a)(3) *28 USCS §*

1343, which provides jurisdiction for civil rights claims.  The Court also has

supplemental jurisdiction over the state law claims pursuant to 28 USCS § 1367.

12.    This Court has personal jurisdiction over York County because it is a political

subdivision of the Commonwealth of Pennsylvania.

13.    This Court is the proper venue for this case pursuant to 28 U.S.C. §1391(b)(2) *28*

*USCS §*1391 as a substantial part of the events giving rise to the claims occurred in York

County, Pennsylvania, where York County Prison is located.

## FACTS RELATED TO
## THE UNLAWFUL KILLING OF HAYWOOD DEAN DIXON, JR.

14.    At the time of the incidents alleged herein, Haywood was a 39 year-old male,

with a relevant history of physical and mental conditions, including ADHD, diabetes,

neuropathy, acute pancreatitis, hypertriglyceridemia, asthma, insomnia, sleep apnea,

morbid obesity and mood disorder, including recurrent major depressive disorder.

15.    At the time of the incidents alleged herein, Haywood was receiving Social

Security Disability for mental health issues and had been since approximately the age of

7.

16.    On or about July 5, 2023, Haywood was arrested and confined to York County

Prison (hereinafter "YCP").

17.    From Haywood's entry into YCP, Haywood exhibited signs of both physical and

mental health distress.

18.     At all times material hereto, Defendants knew or should have known of Haywood's physical and mental health issues.

19.     On July 5, 2023, between 1755 hours and 1827 hours, Haywood underwent a medical evaluation.

20.     At all times relevant hereto, all signs that Haywood was in both physical and mental distress were ignored by Defendants.

21.     On July 5, 2023, between 2043 hours and 2055 hours, Haywood was again examined in the medical ward.

22.     On July 6, 2023, between 846 hours and 1026 hours, Haywood was again examined in the medical unit.

23.     On July 6, 2023, between 1111 hours and 1126 hours, Haywood was again examined in the medical unit.

24.     On July 6, 2023, Haywood spent most of the early to mid-afternoon lying in his cell.

25.     On July 6, 2023, between 1607 hours and 1650 hours, Haywood was again examined in the medical unit.

26.     On July 6, 2023, Haywood was escorted by an unknown Corrections Officer to the medical unit at 2109 hours, where Haywood sat on a bench until 2111 hours.

27.     On July 6, 2023, at 2114 hours, Haywood was questioned by medical personnel and correction staff, while lying on a bench.  He stated that "...he was not going to hurt anyone and that he did not have the strength to walk or stand."

28.     On July 6, 2023, at or about 2116, Haywood was placed on "Suicide Watch" and was placed in handcuffs and told to comply with officer's directions and was walked to a single person cell.

29.     Haywood was placed in the corner of the single person cell (facing away from corrections officers) and a strip search was ordered and initiated, as a precursor to Haywood being taken to the medical observation unit.

30.     Upon entering the cell, Haywood stated to corrections officers that he felt sick and nauseous and could not bend down and throughout his stay in the cell, he complained repeatedly that he did not feel good and that he wanted to lie down, to no avail, as corrections officers ignored his complaints.

31.     Three corrections officers were in the cell, with one (1) officer pointing a taser gun at Haywood's back and two (2) officers located outside the cell.

32.     At 2117 hours, the other two (2) officers in the cell collectively removed Haywood's handcuffs and instructed him to remove his shoes and hand them to the officers, without turning around.

33.     Haywood pleaded with the officers and complained that he felt sick and nauseous and could not bend down to remove his shoes.

34.     The officers repeated the instructions for Haywood to remove his shoes and hand them to the officers, without turning around, to which Haywood responded, each and every time, that he was sick and wanted to lie down.

35.     He was told to comply with officers' orders or he would be placed in a restraint chair.

36.     At that point, Defendants John/Jane Prison Guards were engaging in a cell extraction.

37.     The restraint chair was ordered by officers and officers in the cell were in the process of handcuffing Haywood, when he turned his head to the officers to tell the officers that he felt sick, in response thereto, the officer pointing the taser at Haywood deployed his taser at Haywood at 2120 hours.

38.     Haywood remained standing after being struck by the taser.

39.     Haywood screamed that he could not take his shoes off and asked why did you tase me.

40.     At no time immediately following being struck by the taser for the first time did Haywood act aggressively towards officers or present a danger to officer safety.

41.     Without any aggressive action from Haywood, the same officer deployed his taser a second time, bringing Haywood to the floor, at which time officers surrounded Haywood and placed him in handcuffs.

42.     At no time during either of the two (2) taser deployments was a medical team present when the taser was discharged.

43.     At no time prior to the two (2) taser deployments, was prior authorization secured to tase Haywood.

44.     Throughout the handcuffing process, Haywood continued to tell all three officers that he did not feel good and that he could not breathe.

45.     Haywood was then dragged out of the cell, while cuffed around his wrists and ankles, and brought to his feet and placed in a restraint chair, with restraining straps around his wrists, his shoulders/axillary region, his lap and his ankles were also cuffed and a spit hood placed on his head at 2124 through 2125 hours.

46.     Haywood was taken to the medical ward at 2127 hours, where the taser deployment sites on Haywood's body were visible and acknowledged.

47.     Haywood only underwent a cursory medical exam, with no medical treatment administered or recommended or special action taken to identify Haywood as a high medical risk inmate.

48.     At 2139 hours, Haywood was moved to a segregated unit, where, prior to his placement in a single cell, his clothes were cut from him, while he was still in the

restraint chair, with Haywood complaining of pain and requesting medical assistance during the entirety of the process.

49.    Officers ignored or failed to respond to Haywood's cries of pain and for medical assistance.

50.    Between 2153 and 2155 hours, Haywood, now naked, was placed in a single cell and the door shut behind him.

51.    Between 2155 and 2227 hours, Haywood was experiencing extreme difficulty breathing, causing him to cry out that he could not breathe and that he needed help.

52.    At no time between 2155 and 2227 hours did any member of the staff of the YCP inquire about Haywood's condition or well-being.

53.    At 2227 hours, a corrections officer placed clothes in Haywood's cell and then left.

54.    From 2227 until 2302 hours, Haywood continued to yell that he could not breathe and that he needed help.

55.    At all times from 2227 until 2302 hours, corrections officers were placed at a location that would allow them to hear Haywood's cries for help.

56.    At no time from 2227 until 2302 hours, did any staff member of YCP or medical personnel respond to Haywood's cries for help.

57.    At 2302 hours a corrections officer and a nurse appeared at Haywood's cell and told him to get dressed, so that he could be evaluated at the medical unit, after which they left.

58.    Trying to comply with the given directive, Haywood sat up. At the time, he was breathing heavily and sweating. He yelled out that if he stood up, then he would fall. With his pleas being ignored, Haywood tried to stand up and fell to the floor at 2308 hours.

59.     Haywood turned over to his back, breathing heavily and sweating and began yelling for help.

60.     Haywood continued to yell for help until 2313, when corrections officers entered his cell.

61.     Upon arrival at his cell, corrections officers sat Haywood up and immediately placed him in handcuffs, causing increased distress.

62.     At 2315 hours, Haywood collapsed, lying on his side with heavy bell/agonal-like breathing until 2316 hours.

63.     As is set forth in the Autopsy Report of Haywood Dixon, Jr., authored by Ramen Starling-Roney, M.D., a medical emergency was called at 2315, and EMS was called at 2317 hours.

64.     Haywood was evaluated by medical staff and CPR started at 2320 hours.

65.     Haywood's handcuffs were finally removed at 2321.

66.     EMS arrived at 2330 hours and continued CPR.

67.     Haywood was not responsive to CPR or any other actions of medical personnel and was pronounced dead at 0006 on July 7, 2023.

68.      Despite numerous requests, Plaintiff has not been provided the available information to fully and properly evaluate the cause of Haywood's death.

69.     Upon information and belief, the unreasonable and unlawful deliberate indifference to Haywood's medical needs led to his death.

**WRONGFUL DEATH ACTION**

70.     Plaintiff, Darcel Dixon, as appointed Administratrix by the County of Lancaster and the parent and dependent of Haywood, hereby brings Wrongful Death claims pursuant to 42 Pa.C.S.A. §8301 (the Pennsylvania Wrongful Death Statute) and Pa R.C.P.  2202(a), on behalf of all those persons entitled by law to recover damages as a

result of the wrongful death of Haywood.

71.     The name and address of all persons legally entitled to recover due to the wrongful death of Haywood is Darcel Dixon1632 Judie Lane, Apt. J-6, Lancaster, PA 17603.

72.     No other action has been brought to recover for Mr. Dixon's death under the aforementioned statute(s).

73.     Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that the Plaintiffs decedent, Haywood, would have rendered to the wrongful death beneficiaries but for his traumatic, untimely and unnatural death.

74.     Plaintiff claims damages for payment of all medical bills and/or expenses.

75.     Plaintiff claims damages for payment of funeral and burial expenses.

## SURVIVAL ACTION

76.     Plaintiff also brings a Survival Action under the Pennsylvania Survival Statute, 42 Pa.C.S.A. § 8302, and pursuant to 20 Pa.C.S.A. § 3373, for all damages recoverable under the Statute, including but not limited to, loss of income both past and future income potential, as well as, pain and suffering prior to death, and for emotional distress suffered by Plaintiff's decedent, Haywood, from the initiation of the assault upon him until the ultimate time of his death.

### COUNT I: VIOLATION OF THE FOURTEENTH AMENDMENT
### EXCESSIVE FORCE ON A PRETRIAL DETAINEE
*Plaintiff v. John/Jane Doe Prison Guards 1-10*

77.     The preceding paragraphs are incorporated by reference as though laid out fully herein.

78.     At all times material hereto, John/Jane Doe Prison Guards 1-10 were acting under

10

color of state law.

79.    John/Jane Doe Prison Guards 1-10 dragged Haywood, tased him, restrained him and failed to obtain necessary and timely medical care, all contributing to and causing his untimely and unnatural death.

80.    The actions of John/Jane Doe Prison Guards 1-10 were intentional, objectively unreasonable and were not rationally related to any legitimate non-punitive governmental purpose.

81.    The actions of John/Jane Doe Prison Guards 1-10 deprived Haywood of rights secured by the Constitution and laws of the United States.

82.    The actions of John/Jane Doe Prison Guards 1-10, acting in the course and scope of their employment and/or acting in their personal capacities in repeatedly ignoring Haywood's cries for help, demonstrated deliberate indifference and/or reckless or callous indifference to his serious medical needs.

83.    As a result of the actions of John/Jane Doe Prison Guards 1-10, Haywood suffered mental anguish, extreme pain, agony and an ultimately death.

84.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, and pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

    **WHEREFORE,** Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, pain and suffering, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985

and 1988, and any other remedies legally appropriate.

## COUNT II: ASSAULT AND BATTERY
*Plaintiff v. John/Jane Doe Prison Guards 1-10*

85.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

86.    At all times material hereto, John/Jane Doe Prison Guards 1-10 were acting under the color of state law.

87.    John/Jane Doe Prison Guards 1-10, without justification, tased Haywood, restrained him, covered his head with a spit hood and failed to obtain necessary and timely medical care, all contributing to and causing his untimely and unnatural death.

88.    The actions of John/Jane Doe Prison Guards 1-10 were intentional, objectively unreasonable and constituted willful misconduct, crime, and actual malice.

89.    As a result of the actions of John/Jane Doe Prison Guards 1-10, Haywood suffered mental anguish, extreme pain, agony and ultimately death.

90.    The actions of John/Jane Doe Prison Guards 1-10 by, without justification, tasing Haywood, restraining him, covering his head with a spit hood, all while he was in physical and mental distress, and failing or refusing to obtain necessary and timely medical care increased Haywood's risk of harm.

91.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

WHEREFORE, Plaintiff demands judgment in her favor, and against Defendants pursuant to state law, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary

damages as provided by law, and any other remedies legally appropriate.

**COUNT III: NEGLIGENCE**
*Plaintiff v. John/Jane Doe Prison Guards 1-10*

92.     The preceding paragraphs are incorporated by reference as though laid out fully.

93.     At all-time material hereto, John/Jane Doe Prison Guards 1-10 were acting under the color of state law,

94.     At all times material hereto, John/Jane Doe Prison Guards 1-10 were acting  in the normal course and scope of their employment with York County and YCP.

95.     As prison guards responsible for the care of prisoners, John/Jane Doe Prison Guards 1-10 had a duty to provide reasonable care for Haywood's health and safety while he was incarcerated in YCP.

96.     John/Jane Doe Prison Guards 1-10 breached their duty of care.

97.     John/Jane Doe Prison Guards 1-10 breached their duty by employing excessive force against Haywood and by willfully and repeatedly ignoring Haywood's cries for help and failing to provide necessary medical care.

98.     It is believed and therefore averred that Haywood's death was the result of the following acts of negligence and/or omissions by the John/Jane Doe Prison Guards 1-10, acting individually or in concert with other John/Jane Doe Prison Guards 1-10, by virtue of the following acts and any other act or omission alleged herein:

  a) Failing to provide proper health care services pursuant to 37 Pa. Code §95.220;

  b) Failing to provide a proper physical examination pursuant to 37 Pa. Code §95.221;

  c) Failing to utilize and or provide proper emergency medical care procedures pursuant to 37 Pa. Code §95.222;

d.)     Failing to utilize and or provide proper mental health services
        pursuant to 37 Pa. Code §95.223;

e)      Failing to provide proper medications and pharmaceuticals pursuant to 37
        Pa. Code §95.224;

f)      Failing to ensure adequate health care services were available to all
        inmates;

g)      Failing to follow an emergency medical plan;

h)      Failing to follow proper use of force policies;

i)      Failing to provide a proper medical assessment after the use of force.

99.     As a result of the aforesaid negligence of John/Jane Doe Prison Guards 1-10,

Haywood Dixon died.

        **WHEREFORE,** Plaintiff demands judgment in her favor, and against

Defendants pursuant to state law, in an amount in excess of One Million Dollars

($1,000,000.00), including interest, delay damages, costs of suit, general and specific

damages, including both survival and wrongful death damages, punitive and exemplary

damages as provided by law, and any other remedies legally appropriate.

### COUNT IV: VIOLATION OF THE FOURTEENTH AMENDMENT
### DELIBERATE INDIFFERENCE
### TO A SERIOUS MEDICAL NEED
*Plaintiff v. John/Jane Doe Prison Guards 1-10, John/Jane Doe Prime
Care Employees 1-10, and PrimeCare Medical,  Inc.*

100.    The preceding paragraphs are incorporated by reference as though laid out fully

herein.

101.    At all times material hereto, John/Jane Doe Prison Guards 1-10 acted under the

color of state law.

102.    Throughout the entirety of Haywood's presence in YCP, it was obvious to any

reasonable individual who encountered Haywood that he needed immediate medical

attention.

103.    John/Jane Doe Prison Guards 1-10 observed Haywood in a physically distressed, mentally unstable and/or disoriented state, heard his complaints that he could not breathe and that he was in pain, heard his cries for help and, throughout Haywood's entire stay at Defendant YCP, failed to or refused to take actions to afford him medical care.

104.    John/Jane Doe PrimeCare Employees 1-10 observed Haywood in and outside of his cell in a physically distressed, mentally unstable and/or disoriented state and took no actions to afford him medical care.

105.    Once Haywood was removed from his cell John/Jane Doe Prison Guards 1-10 and John/Jane Doe Prime Care Employees 1-10 failed to obtain and/or provide necessary emergency care required due to Haywood's obvious physical ailments.

106.    The action or omissions of John/Jane Does Prison Guards 1-10, John/Jane Does PrimeCare Employees 1-10 and PrimeCare deprived Haywood of rights secured by the Constitution and the laws of the United States.

107.    As a result of the actions of John/Jane Doe Prison Guards 1-10 and John/Jane Doe PrimeCare Employees 1-10, Haywood suffered mental anguish, extreme pain and agony and ultimately died.

108.    Defendant PrimeCare is sued in this Count under a respondeat superior theory of liability as John/Jane Doe PrimeCare Employees 1-10 were acting within the course and scope of their employment with PrimeCare when they refused to provide Haywood with necessary medical care.

    **WHEREFORE,** Plaintiff demands judgment in her favor, and against Defendants pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars

($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, pain and suffering, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

### COUNT V: MUNICIPAL LIABILITY
*Plaintiff v. York County, York County Prison Board,*
*Jonelle Harter Eschbach, Warden Adam Ogle.*

109.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

110.    At all times material hereto, all defendants identified in this Count were acting under the color of state law.

### Lack of Policies and Training

111.    Among the Right-to-Know requests Plaintiffs' counsel submitted to York County were requests, inter alia, for prison policies relating to: the use of force by corrections officers, policies governing screening and treatment of mental health issues, policies relating to confrontations with mentally unstable individuals, policies regarding time lapse between cell inspections and policies for response to prisoners that are in distress.

112.    York County denied Plaintiff's request and refused to produce any information relating to any policies in response to this request.

113.    Therefore, upon information and belief, York County and the York County Prison Board, at all times material hereto, did not have, maintain or enforce any formal policies governing the use of force by corrections officers, policies governing screening and treatment of medical distress issues, or policies relating to confrontations with inmates that are in medical crisis.

114.    Specifically, York County and the York County Prison Board did not have, maintain or enforce policies for training its corrections officers in the following:

    i.   Proper use of force;

    ii.   Observation and treatment of individuals in isolation;

    iii.   Observation and treatment of individuals placed in suicide watch

    iv.   Cell extractions;

    v.   The use of tasers;

    vi.   The use of restraints;

    vii.   The use of spit hoods;

    viii. Identifying and dealing with mentally unstable individuals and/or those placed on suicide watch;

    ix.   Responding to inmates' complaints of serious medical issues;

    x.   Responding to inmates' requests for medical assistance;

    xi.   Recognizing an inmate that is in medical distress;

    xii.   Adhering to a schedule of cell inspections;

    xiii. Providing medical care to inmates in medical distress;

    xiv. Providing medical care to acutely injured or ill individuals;

115.    Upon information and belief, York County does or did not for all times material hereto train its prison guards on proper strategies, techniques, their legal responsibilities, or the limits of their legal authority as it relates to the use of force by corrections officers, screening and treatment of mental health issues, confrontations with mentally unstable individuals or obtaining and/or providing acute critical medical care.

116.    As a result of the lack of policies or training by York County, for all times material hereto, York County prison guards were woefully ill-equipped to handle these situations and are ignorant of the limits of their lawful authority.

117.    York County's lack of policies and training violated or were a substantial factor

behind the deprivation of Haywood's constitutional rights.

### The Death of Everett Palmer

118.    On or about April 9, 2018, Everett Palmer, Jr. died while in custody in the York County Prison.

119.    In the aftermath of Mr. Palmer's death, the York County District Attorney's Office empaneled a Grand Jury to hear testimony and receive evidence, mostly in the form of surveillance videos from inside the YCP during the relevant times, regarding a more than two (2) investigation relating to Mr. Palmer's death.

120.     The Grand Jury produced a 174 page report (hereinafter "GJ report") which identified actions and practices of defendants that could be improved upon to ensure the safety and well-being of those incarcerated in YCP.

121.    The GJ report put defendants on notice that they were not employing best practices to ensure the safety and well-being of those incarcerated in the YCP.

122.    The GJ report concluded by enumerating twenty-four recommendations that were designed to prevent future deaths of incarcerated inmates at York County Prison.

123.    The report was made public by then District Attorney David Sunday in March 2021, approximately two and one half (2 ½) years prior to the death of Haywood Dixon.

124.    The recommendations included, *inter alia*:

      i.     A negotiator or de-escalator should be engaged prior to a cell extraction

.

      ii.    Medical staff should be required to be present prior to a cell extraction.

      iii.   EMS should be summoned to the prison prior to a cell extraction.

      iv.   York County Prison should reconsider the use of electronic stun devices during cell extractions.

      v.    Prison staff should develop and implement training on how to recognize developmental disabilities.

vi.    Crisis-intervention team training should be expanded among prison staff.

125.    Defendants failed to implement any of the recommendations of the GJ report.

126.    As set forth above, at the time of Haywood's incarceration in YCP, there were no policies, procedures or practices maintained or enforced by defendants that were designed to ensure the safety and well-being of Haywood.

127.    Defendants' failure or refusal to implement any of the recommendations made in the GJ report or to have policies, procedures or practices that ensured the safety and well-being of Haywood during his incarceration at YCP is a violation of his civil rights.

128.    Despite clear notice of violation of Haywood's constitutional rights, defendants demonstrated deliberate indifference to his safety while in their custody - a deliberate indifference that killed Haywood Dixon.

**Custom of Excessive Force and Inmate Abuse**

129.    The unchecked use of violence and excessive force against inmates in York County is widespread.

130.    In 2013, York County Prison Guards Graff, Whitcomb, and Haynes organized what they called the "Retard Olympics."

131.    The prison guards would force inmates to "do stupid stuff for food and coffee."

132.    The guards forced one inmate to drink a gallon of milk in an hour, eat a spoonful of cinnamon, and drink water with pepper foam in it among other degrading tasks.

133.    Being unsatisfied with sophomoric pranks, the guards would force inmates to wrest them or subject them to physical violence.

134.    Guards Graff and Whitcomb beat one inmate about his arms and legs until they went numb.

135.    Prison guard Whitcomb once bribed an inmate with food to permit him to choke out the inmate.

136.    Additionally, the guards arranged a "fight club" in which they would force inmates to fight each other in a storage closet while the guards watched.

137.    In 2016, prison guards viciously assaulted two ICE detainees following a dispute regarding the number of blankets the detainees were allowed to have.

138.    A captain sprayed the detainees with mace while a member of the prison Certified Emergency Response Team (CERT team) physically beat the other detainee in an effort to punish the two detainees.

139.    The beating resulted in one detainee suffering from broken dentures from being slammed on a table, as well as knee and elbow injuries.

140.    More than four days passed before he was seen for medical care.

141.    When a grievance was filed, the York County Warden covered up the vicious assault by defending the CERT team for utilizing a "new technique" on the detainee.

142.    In May of 2017, prison guards Cessna, Velasquez, Fitski, and others engaged in a savage beating of inmate Aaron Ornstein.

143.    The guards became annoyed with how slowly Ornstein was moving and kicked his legs causing him to fall.

144.    Once he fell, the guards began kneeing, punching and kicking Ornstein while he was on the ground.

145.    As a result of the beating, Ornstein required stitches to his eye.

146.    Additionally, he suffered a broken clavicle which caused his right lung to fill 3.5 liters of blood resulting in difficulty breathing.

147.    A complaint filed by Ornstein was ignored by then acting Warden Doll, and Ornstein was punished for the incident.

148.    Inmate abuse at York County Prison was not limited to physical violence.

**Custom of Excessive Force and Inmate Abuse**

149.    The unchecked use of violence and excessive force against inmates in York County is widespread.

150.    In 2013, York County Prison Guards Graff, Whitcomb, and Haynes organized what they called the "Retard Olympics".

151.    The prison guards would force inmates to "do stupid stuff for food and coffee".

152.    The guards forced one inmate to drink a gallon of milk in an hour, eat a spoonful of cinnamon, and drink water with pepper foam in it among other degrading tasks.

153.    Being unsatisfied with sophomoric pranks, the guards would force inmates to wrest them or subject them to physical violence.

154.    Guards Graf and Whitcomb beat one inmate about his arms and legs until they went numb.

155.    Prison guard Whitcomb once bribed an inmate with food to permit him to choke out the inmate.

156.    Additionally, the guards arranged a "fight club" in which they would force inmates to fight each other in a storage closet while the guards watched.

157.    In 2016, prison guards viciously assaulted two ICE detainees following a dispute regarding the number of blankets the detainees were allowed to have.

158.    A captain sprayed the detainees with mace while a member of the prison Certified Emergency Response Team (CERT team) physically beat the other detainee in an effort to punish the two detainees.

159.    The beating resulted in one detainee suffering broken dentures from being

slammed on a table, as well as knee and elbow injuries.

160.    More than four days passed before he was seen for medical care.

161.    When a grievance was filed, the York County Warden covered up the vicious assault by defending the CERT team for utilizing a "new technique" on the detainee.

162.    In May of 2017, prison guards Cessna, Velasquez, Fitski, and others engaged in a savage beating of inmate Aaron Ornstein.

163.    The guards became annoyed with how slowly Ornstein was moving and kicked his legs causing him to fall.

164.    Once he fell, the guards began kneeing, punching and kicking Ornstein while he was on the ground.

165.    As a result of the beating, Ornstein required stitches to his eye.

166.    Additionally, he suffered a broken clavicle which caused his right lung to fill 3.5 liters of blood resulting in difficulty breathing.

167.    A complaint filed by Ornstein was ignored by Warden Ogle and Ornstein was punished for the incident.

168.    Inmate abuse at YCP was not limited to physical violence.

169.    There has existed a long history of York County Prison Guards trafficking illegal drugs into the prison.

170.    Warden Ogle and the York County Prison Board either actively encourage the behavior by overlooking the trafficking or are completely incompetent to stop the known illicit conduct.

171.    During 20218, York County Prison Guard Amanda Anderson was actively trafficking heroin and contraband within York County Prison.

172.    Anderson was arrested in June of 2018, however, this did nothing to slow the trafficking of drugs by prison guards in York County.

173.    On January 23, 2020, an inmate at York County Prison was treated for an overdose.

174.    York County and Warden Ogle attempted to cast aside suspicion of prison guards trafficking drugs and claimed that the inmate had smuggled the drugs in himself, however at the time of the overdose the inmate had been in custody for approximately 49 days.

175.    The widespread custom of excessive force and inmate abuse was ratified and tolerated by York County and the York County Prison Board.

176.    This widespread custom and practice were a moving force behind the death of Haywood.

    **WHEREFORE**, Plaintiff demands judgment in her favor, and against Defendants, pursuant to 42 U.S.C. § 1983, in an amount in excess of One Million Dollars ($1,000,000.00), including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful damages, punitive damages and exemplary damages as provided by law, attorney's fees under U.S.C. 1985 and 1988, and any other remedies legally appropriate.

Respectfully submitted,
/s/ David Cherry_____                                    Date: July 3, 2025
David Cherry, Esquire

**The Cherry Firm**                        **Law Office of Joseph Silvestro, LLC**
David Cherry, Esquire                      Joseph Silvestro, Esquire
PA Attorney I.D. No.:                      PA Attorney I.D. No.: 86275

11 E. Second Street                        11 E. Second Street
Media, PA 19063                            Media, PA 19063
(484)620-2100                              (610)627-0891
DCherry@Thecherryfirm.com                  jsj@josephsilvestrolaw.com

                                           *Pro Hac Vice Application Forthcoming*